# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **ROBERT J. BUCHANAN,** | : | |
| **Plaintiff** | : | |
| **v.** | : | |
| **UNITED STATES OF AMERICA, JOHN ASHCROFT, Former Attorney General, HARLEY G. LAPPIN, Director of the Bureau of Prisons, JOHN OR JANE DOE, U.S. Bureau of Prison Health Service Medical Director, HARRELL WATTS, U.S. Bureau of Prison Administrative National Inmate Appeals, MICKEY RAY, Former N.E. Regional Director of the Bureau of Prisons, D. SCOTT DODRILL, Current N.E. Regional Director of the Bureau of Prisons, HENRY J. SADOWSKI, N.E. Regional Counsel, JOHN or JANE DOE, Warden of FDC of Philadelphia, Pennsylvania, JOHN or JANE DOE, Associate Warden of FDC of Philadelphia, Pennsylvania, JOHN or JANE DOES, Associate Warden (O) of FDC, Philadelphia, Pennsylvania, A. MARTINEZ, Health Service Director Administrator at FDC Philadelphia, Pennsylvania, JOHN or JANE DOE, Assistant Health Service Administrator, D. MASSA, M.D., Medical Physician at FDC of Philadelphia, G. REYNOLDS, M.D., Medical Physician of FDC of Philadelphia, D. SMITH,** | : : : : : : : : : : : : : : : : : : : | **CIVIL ACTION NO. 1:05-0887**<br><br>**(KANE, D.J.)**<br>**(MANNION, M.J.)** |

**Registered Nurse at FDC at** :
**Philadelphia, R. RITTER, Mid-**
**Level Practitioner at FDC of** :
**Philadelphia, JOHN NASH,**
**Former Warden of FCI-** :
**Schuykill, Minersville,**
**Pennsylvania, KIM ASK-** :
**CARLSON, Associate**
**Warden (O) FCI-Schuykill,** :
**Minersville, Pennsylvania, NEIL**
**ROBINSON, Associate Warden** :
**(P) FCI-Schuykill, Minersville,**
**Pennsylvania, A. PRANTOW,** :
**Former Unit 4 Manager at SCI-**
**Schuykill Minersville,** :
**Pennsylvania, DENISE SHIRE,**
**Unit 4-A Counselor at FCI-** :
**Schuykill, Minersville,**
**Pennsylvania,** :

                    **Defendants** :

## REPORT AND RECOMMENDATION

Presently pending before the court is the defendants' motion to dismiss and for summary judgment.  (Doc. No. 20).  Based upon the court's review of the record in the instant action, it is recommended that the defendants' motion be granted.

## I.    PROCEDURAL HISTORY

By way of relevant background, on May 2, 2005, the plaintiff, an inmate at the Federal Correctional Institution at Schuylkill, ("FCI-Schuylkill"),

Minersville, Pennsylvania, filed this <u>Bivens</u>[1] action pursuant to 28 U.S.C. §1331[2], in which he alleges inadequate medical treatment for an injured right index finger, as well as involuntary exposure to environmental tobacco smoke, ("ETS"), in violation of his Fifth, Eighth, and Fourteenth Amendment rights[3]. (Doc. No. 1).  In addition, the plaintiff filed a supporting "declaration," (Doc. No. 2), and memorandum of law, (Doc. No. 12).

The filing fee having been paid, (Doc. Nos. 8, 10), an order was issued directing the clerk to prepare the summons and forward it to the plaintiff for service upon the defendants, (Doc. No. 13).

After having been granted an extension of time to answer the plaintiff's complaint, (Doc. No. 18), on January 20, 2006, the defendants filed the instant motion to dismiss and for summary judgment, (Doc. No. 20).   On February 3, 2006, the defendants filed a brief in support of their motion, (Doc.

---

[1]<u>Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics</u>, 403 U.S. 388 (1971).

[2]Although the plaintiff includes allegations in his complaint that he has exhausted his remedies under the Federal Tort Claims Act, ("FTCA"), 28 U.S.C. §§2671-80, there is no indication that the instant action is being pursued pursuant to the FTCA.  In fact, the plaintiff on numerous occasions indicates only that the action is brought as a <u>Bivens</u> action.

[3]In his complaint, the plaintiff had also alleged that the defendants had engaged in a conspiracy to deprive him of his constitutional rights.  However, in his supporting memorandum, he retracted that claim, stating "[p]erhaps the original filing's characterization of this event as a 'conspiracy' was too harsh or unrealistic, . . ."  (Doc. No. 29, p. 3).  Therefore, the court will not address any claim of a conspiracy in the instant report.

No. 23), as well as a statement of facts, (Doc. No. 24).  The plaintiff filed an opposing brief on February 27, 2006.  (Doc. No. 29).  After having requested and been granted permission to do so, (Doc. Nos. 30, 33), on March 9, 2006, the defendants submitted an additional exhibit in support of their motion, (Doc. No. 31, Attachment).  Also on that date, the defendants submitted a reply brief in support of their motion to dismiss and for summary judgment. (Doc. No. 32).  On March 29, 2006, the plaintiff filed a sur-reply brief. (Doc. No. 34).

## II.    LEGAL STANDARD[4]

Summary judgment is appropriate if the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed.R.Civ.P. 56(c).

The Supreme Court has stated that:

> ". . . [T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails

---

[4]The defendants bring their motion as one to dismiss and for summary judgment.  The dismissal portion of the motion seeks to dispose of certain of the defendants, while the summary judgment portion seeks to dispose of the plaintiff's substantive claims.  In considering the record in the instant action, the court finds that summary judgment should be granted in favor of the defendants.  Therefore, the court need not address the partial dismissal aspect to the defendants' motion herein.  The court notes, however, that the dismissal portion of the defendants' motion also appears to be well-taken.

> to make a showing sufficient to establish the
> existence of an element essential to that party's case,
> and on which that party will bear the burden of proof
> at trial.  In such a situation, there can be 'no genuine
> issue as to any material fact,' since a complete failure
> of proof concerning an essential element of the
> nonmoving party's case necessarily renders all other
> facts immaterial.  The moving party is 'entitled to
> judgment as a matter of law' because the nonmoving
> party has failed to make a sufficient showing on an
> essential element of her case with respect to which
> she has the burden of proof."

Celotex Corp. v. Catrett, 477 U.S. 317, 323-24 (1986).

The moving party bears the initial responsibility of stating the basis for its motion and identifying those portions of the record which demonstrate the absence of a genuine issue of material fact.  Id.  The moving party can discharge that burden by "showing . . . that there is an absence of evidence to support the nonmoving party's case."  Id. at 325.

Issues of fact are genuine "only if a reasonably jury, considering the evidence presented, could find for the nonmoving party."  Childers v. Joseph, 842 F.2d 689, 693-94 (3d Cir. 1988)(citations omitted).  Material facts are those which will effect the outcome of the trial under governing law.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  The court may not weigh the evidence or make credibility determinations.  Boyle v. County of Allegheny, 139 F.3d 386, 393 (3d Cir. 1998).  In determining whether an issue of material fact exists, the court must consider all evidence and inferences drawn therefrom in the light most favorable to the nonmoving party.  Id. at 393.

If the moving party meets his initial burden, the opposing party must do more than raise some metaphysical doubt as to material facts, but must show sufficient evidence to support a jury verdict in its favor. Id.

## III.   DISCUSSION

In his complaint and supporting memorandum, the plaintiff alleges that, on August 2, 2003, he received ". . . a serious injury to his right index finger . . .," while confined at the Federal Detention Center, Philadelphia, ("FDC-Philadelphia"), Pennsylvania.   According to the plaintiff, the medical department at FDC-Philadelphia examined his injury and determined it to be ". . . a 2.5 cm laceration," and cleaned and sutured the wound.

On September 29, 2003, the plaintiff alleges that he complained about the level of care he received at FDC-Philadelphia.  Subsequently, on October 15, 2003, the plaintiff alleges that he was examined by a specialist, Paul H. Steinfield, M.D.,[5] as the result of a hand therapy referral while at FDC-Philadelphia.

On November 3, 2003, the plaintiff was transferred to FCI-Schuylkill. From November 11, 2003, through April 29, 2004, the plaintiff alleges that he filed various administrative remedies pursuant to the Prison Litigation Reform Act, ("PLRA"), with respect to ". . . problems concerning his injured right index

---

[5]The court notes that Dr. Steinfield has not been named as a defendant in this action.

finger," as well as ". . . his complaints of involuntary exposure to (ETS), i.e. Environmental Tobacco Smoke, second hand tobacco smoke."[6]  According to the plaintiff, the various administrative remedies were addressed and denied by defendants Shires, Nash, Dodrill, Lappin, Watts, and Sadowski.  As a result of the filing of these administrative remedies, the plaintiff indicates that he has fully exhausted his administrative remedies with respect to the claims which he now attempts to raise.

The plaintiff is claiming violations of his Fifth, Eighth, and Fourteenth Amendment rights, based upon his allegations of inadequate medical treatment for his right index finger.  Specifically, the plaintiff alleges that the defendants "den[ied] him adequate medical treatment and caused him to suffer with lingering pain, where his finger is deformed caused by the inadequatcy (sic) of the level of care given to the plaintiff."  (Doc. No. 12, p. 6).   The plaintiff further alleges that "[t]he action and conduct of the defendants, in this case in denying the plaintiff, adequate medical care for his injured right index finger, causing him a great deal of pain, and inflicted pain upon the plaintiff, when the (FDC) of Phila. Pa. defendants, by failing to give him any pain medication before or after stitching up his injured right index

_____

[6]As previously noted, the plaintiff further alleges that from May 20, 2004, through November 17, 2004, he filed administrative remedies pursuant to the FTCA, thereby exhausting his administrative remedies pursuant to that provision.  However, there is no indication that the plaintiff is bringing the instant action pursuant to the FTCA.

finger . . ."  (Doc. No. 12, p. 7).

Moreover, the plaintiff alleges that the defendants violated his Eighth Amendment rights when they deliberately ignored his complaints regarding involuntary exposure to ETS[7].  As a result, the plaintiff alleges that he suffered with eye irritation, nausea, headaches, and breathing problems.

Based upon the foregoing, the plaintiff is seeking declaratory and injunctive relief, as well as compensatory and punitive damages.

To the extent that the defendants' motion is brought as one for summary judgment, in an attempt to pierce the allegations of the plaintiff's complaint and establish that no genuine issues of fact remain for trial, the defendants have provided statements of material fact, supported by various documentation, which establish that on March 27, 2003, the plaintiff was taken into the custody of the Bureau of Prisons, ("BOP"), as a pre-trial detainee at FDC-Philadelphia.  (Doc. No. 24, Ex. 1).

On October 8, 2003, the plaintiff was convicted of offenses involving crack cocaine and sentenced to 150 months of imprisonment.  (Id.).

On November 3, 2003, the plaintiff was transferred to FCI-Schuylkill. (Id.).  Upon his arrival at FCI-Schuylkill, and up until December 29, 2003, the plaintiff was housed in a "common area" cell, which houses six to ten inmates.

---

[7]The plaintiff apparently limits this claim to the time period of November 3, 2003, when he was transferred to FCI-Schuylkill, until November 15, 2004, when a policy was enacted banning all smoking within FCI-Schuylkill.  (Doc. No. 12, p. 10).

(Doc. No. 24, Ex. 2).

On December 29, 2003, the plaintiff was moved to an "individual" two-man cell and, as of the filing of the defendants' materials, continued to be housed in this status. (Id.).

At all times during which the plaintiff was housed at FCI-Schuylkill, smoking was prohibited in common area cells. (Id.). Moreover, six months before the plaintiff arrived at FCI-Schuylkill, defendant Nash advised the inmates that smoking was not allowed in common areas and that staff members would vigorously enforce all smoking regulations. (Id.).

With respect to individual cells, smoking was allowed with the door closed. (Id.). However, not all two-man cells are smoking cells. (Id.). Two-man cells were identified as non-smoking, if one of the occupants was a non-smoker. (Id.).

The defendants' materials provide that effective November 15, 2004, tobacco was declared contraband at FCI-Schuylkill. (Doc. No. 24, Ex. 2).

FCI-Schuylkill was constructed in 1991 without air conditioning. (Doc. No. 24, Ex. 3). The ventilation system at FCI-Schuylkill does not recirculate indoor air from the cells. Cells have individual exhaust vents. As a result, the defendants' materials provide that air from a two-man cell designated as "smoking" cannot travel from one cell to another via the ventilation system. (Doc. No. 24, Exs. 2 & 3).

On December 5, 2003, the plaintiff filed a grievance in which he

9

complained that his cell mates were smoking in the common area cell.  (Doc.

No. 24, Ex. 1).  Defendant Shires responded to the plaintiff's grievance on

December 9, 2003, as follows:

> All common areas [–] including the common area
> living quarters [–] are all non smoking areas and any
> inmates found to be smoking in these area[s] will and
> have received disciplinary action.  The unit officers
> are aware of this issue and have been monitoring the
> situation.  I myself have written several incident
> reports for smoking in the common areas.  I am
> constantly monitoring the activities of my common
> areas in the unit.  Unit Officer[]s have written several
> incident reports for smoking in the unit and have even
> posted a sign to further notify inmates of this
> prohibited behavior.

(Doc. No. 24, Ex. 1).

On December 10, 2003, the plaintiff filed a grievance raising the issue

of exposure to ETS with defendant Nash.  (Id.).  Defendant Nash denied the

administrative remedy on December 24, 2003.  In doing so, defendant Nash

noted that smoking was prohibited and that he had ordered staff members to

enforce the policy.  (Id.).

The plaintiff filed an appeal of defendant Nash's decision to the

Regional Office, which denied the appeal on February 12, 2004.  (Id.).  In

doing so, the Regional Office noted:

> [i]nstitution staff at FCI Schuylkill [have] been diligent
> in their efforts to enforce the smoking policy and to
> take appropriate disciplinary action against violators.
> You also have a responsibility to report violations of
> this policy to staff to ensure that violators are held
> accountable for their actions.

(Id.).

The plaintiff filed a final appeal to the Central Office, which was also denied.  (Id.).  In denying the plaintiff's final appeal, defendant Watts noted that defendant Nash and his staff had "taken reasonable steps to limit exposure to smoke by enforcing the no-smoking policy when violations are observed by staff."  (Id.).

According to the defendants' documents, the plaintiff purchased tobacco products in the commissary at FCI-Schuylkill during the time he was filing administrative remedies with respect to being involuntarily exposed to ETS. (Doc. No. 24, Ex. 1).  To this extent, the plaintiff purchased a pouch of rolling tobacco on December 22, 2003; a single pack of cigarettes on February 9, 2004; fourteen packs of cigarettes between February 9, 2004, and April 5, 2004; and seventeen packs of cigarettes between February 17, 2004, and May 3, 2004.  (Id.).

With respect to the plaintiff's medical treatment, the defendants' materials provide that, upon his arrival at FDC-Philadelphia on March 27, 2003, the plaintiff was given an admissions interview and examination.  (Doc. No. 24, Ex. 4).  The plaintiff reported no major medical problems, but noted that he had experienced dizziness or fainting spells and that he had also experienced high and low blood pressure.  (Id.).  The plaintiff initially denied that he ever used drugs, but later reported that he had used cocaine two weeks prior to his examination.  (Id.).  On all of his intake documentation, the

plaintiff reported that he was a non-smoker. (Id.). The plaintiff was classified as needing a level of care "one," indicating that he had no significant medical needs.

On April 9, 2003, defendant Ritter noted that the plaintiff had a vision and hearing screening at which he reported that he was "essentially healthy." These notes were reviewed by defendant Massa. (Id.).

On August 2, 2003, the plaintiff was seen in health services, after injuring his right index finger playing basketball. (Id.). The plaintiff reported that he was reaching for the ball and hit his finger either on his leg or on the leg of another player. The plaintiff further reported having bent his finger back and then forward, and that he then noticed it was bleeding. (Id.). Upon examination, defendant Smith noted that the plaintiff had a 2.5 cm laceration to his right index finger, with a copious amount of bleeding. It was further noted that the plaintiff was light-headed and dizzy. The plaintiff's knuckle area was noted to be painful, an "eight" on a scale of one to ten. (Id.). Defendant Smith cleaned and sterilized the area, and administered a tetanus shot. (Id.). Defendant Martinez sutured the plaintiff's wound. (Id.). The defendants' materials indicate that defendant Martinez discussed with the plaintiff the possibility that there may be some tendon damage. (Id.). The plaintiff's treatment was reviewed by defendant Reynolds, who gave the plaintiff instructions regarding caring for the wound and sutures. (Id.).

On August 9, 2003, the plaintiff had his sutures removed. (Id.). At that

time, the plaintiff reported to defendant Smith that his finger was still hurting. Upon examination, the plaintiff's finger showed mild swelling, with decreased movement and flexibility.  Distal blood flow was noted to be intact.  The plaintiff reported that his finger was painful on flexion.  (Id.).  The plaintiff was prescribed Ibuprofen and Amoxicilin.  (Id.).

Defendant Massa reviewed the plaintiff's August 9, 2003, treatment notes on August 11, 2003, and examined the plaintiff at sick call on September 10, 2003.  (Id.).  Defendant Massa noted that the plaintiff presented with an inability to flex his right index finger at the proximal interphalangeal joint.  (Id.).  The plaintiff was also noted to have a problem with full extension.  The laceration was noted to be healed.  (Id.).  The plaintiff noted at this time that he was a non-smoker, who exercised seven times per week.  The plaintiff's blood pressure was noted to be 120/68 and his heart rate was 64.  His temperature was 96.6.  (Id.).  Defendant Massa counseled the plaintiff regarding the injury and treatment, and advised him to continue physical therapy.  Defendant Massa referred the plaintiff for further treatment as deemed necessary by an orthopedic specialist.  (Id.).

On or about October 10, 2003, the plaintiff was examined by Dr. Paul H. Steinfield, an outside orthopedic specialist.  (Id.).  Upon examination, Dr. Steinfield noted that the plaintiff had decreased range of motion and that he should be treated three times per week for four weeks with exercises that would improve range of motion and tendon glide.  Dr. Steinfield noted no

fracture or volar plate injury.  No follow-up appointment was scheduled.  (Id.).

At the end of October 2003, the plaintiff was transferred to FCI-Schuylkill via the United States Penitentiary at Lewisburg, ("USP-Lewisburg"), Pennsylvania.  The plaintiff's health was screened at USP-Lewisburg, and nothing remarkable was noted.  (Id.).

The plaintiff arrived at FCI-Schuylkill on November 3, 2003.  (Id.).  At that time, the plaintiff underwent intake screening by Brigida Zabala, a Physician's Assistant.  (Doc. No. 24, Ex. 4).  PA Zabala noted that the plaintiff had a history of "some sort of drug abuse" and that he had been smoking for two years.  (Id.).  The plaintiff's right index finger injury was also noted and the plaintiff was provided a lower bunk pass.  (Id.).

On November 4, 2003, the plaintiff reported to sick call and was seen by PA M. Wambach.  (Id.).  The plaintiff presented with pain in his finger of "four" on a scale of one to ten.  Notes indicate that PA Wambach examined the plaintiff, took his vital signs, instructed the plaintiff on the proper taking of anti-inflammatory medication, and advised the plaintiff to watch the call-outs for a follow-up appointment.  (Id.).  The plaintiff was referred to an orthopedic specialist for a second opinion by Dr. Toa Chaw.  (Id.).  X-rays were also ordered to be taken.  (Id.).

On November 13, 2003, x-rays of the plaintiff's finger were reviewed by Dr. Steven Perlin.  (Id.).  No bony abnormality was noted.  Dr. Perlin characterized the injury as soft tissue swelling about the PIP joint, and opined

that, if there was a hyper-extension injury, this may represent a non-osseous volar plate injury.  (Id.).

On November 21, 2003, the plaintiff was examined by PA Ken Hubble. (Id.).  PA Hubble noted that the plaintiff presented with extension difficulties with active range of motion.  (Id.).

On December 3, 2003, the plaintiff was examined by Dr. Perkins, a contract orthopedic specialist, who noted no bone abnormality and no structural tendon damage.  Dr. Perkins noted a decreased range of motion that, he opined, would need continued exercises to increase range of motion. (Id.).  Dr. Perkins noted no neurovascular deficits and recommended physical therapy to stretch the tendons. (Id.).  Dr. Perkins informed the plaintiff that his injury would "never be the same."  (Id.).

In December 2003, the plaintiff's medical records were reviewed by Dr. Chaw and Health Services Administrator Edgardo Ong.  (Id.).  On December 11, 2003, the plaintiff was referred to the Federal Medical Center at Devens, Massachusetts, for physical therapy via telemedicine.  (Id.).  The plaintiff's diagnosis was noted to be a volar over-extension of the right index finger. (Id.).

On December 23, 2003, Dr. Chaw discussed with the plaintiff the result of the orthopedic consult.  (Id.).  The plaintiff indicated that he agreed with the plan for physical therapy and that he understood the medical findings.  (Id.).

On April 30, 2004, the plaintiff reported to sick call with complaints of

15

light-headedness.  (Id.).  He was examined by PA Steffan who noted that the plaintiff did not have any blurred or double vision.  In addition, the plaintiff exhibited no signs of asthma, fever or chills.  (Id.).  It was noted that, upon arriving at Health Services, the plaintiff took a drink from the water fountain and was laughing in the waiting room.  The plaintiff's skin was noted to be warm, but not clammy.  The plaintiff's temperature was 98.2 degrees, his pulse was 57, and his blood pressure was 118/83.  (Id.).  The plaintiff was noted to have no abnormalities.  He was advised to drink lots of fluid and return to work.  (Id.).

On July 9, 2004, the plaintiff injured his left ankle while playing in a basketball tournament.  (Id.).  He was examined by PA Hubble, who noted that he was able to bear weight on his ankle; there was no discoloration or deformity; and that there was mild edema, but neurovascular response was intact.  (Id.).  The plaintiff was diagnosed with a sprained ankle and issued a cane, ACE bandage and ice.  He was advised to keep the ankle elevated and to ice it.  At that time, the plaintiff indicated that his pain was a "three" on a scale of one to ten.  The plaintiff was prescribed Motrin for pain and swelling.  (Id.).  The plaintiff was written an idle pass that excused him from being required to walk or stand for any period over ten minutes.  The plaintiff was advised to return if his symptoms did not resolve.  PA Hubble's diagnosis and treatment were approved by Dr. Hendershot.  (Id.).

On the following day, PA Hubble examined the plaintiff's ankle and

16

noted that it was much improved.  All neurovascular functions were noted to be intact.  (Id.).  It was noted that the plaintiff should be limited in his duties for only about one week.  (Id.).

On July 29, 2004, the plaintiff was seen in morning sick call by PA Steffan, who diagnosed the plaintiff with a severe case of athlete's foot.  (Id.). The plaintiff was told to keep his feet clean and dry, to wear layers of socks, change sneakers, and wear shower shoes while showering.  The plaintiff was prescribed foot lotion for 4-6 weeks.  PA Steffan advised the plaintiff to return if his condition did not improve or became worse.  (Id.).

On October 14, 2004, the plaintiff was screened for a job in the food services department.  (Id.).  At that time, the plaintiff reported that he had not suffered from any respiratory infection, gastroenteritis, hepatitis, HIV, etc., within the last 30 days.  (Id.).  Upon examination, the plaintiff weighed 263 pounds.  He was noted to be alert and oriented times three, fully ambulatory and had no complaints.  (Id.).  The plaintiff was approved for food services work.  (Id.).

The plaintiff next presented to health services on January 25, 2005, complaining of an injury to his right little finger while playing basketball.  (Id.). The plaintiff was seen by Dr. Hendershot, who noted a positive protrusion of the distal phalange on the right.  (Id.).  Neurovascular function was noted to be intact.  However, there was a dorsal dislocation of the DIP joint of the fifth little finger.  (Id.).  Upon obtaining consent, Dr. Hendershot used a digital

17

nerve block and reduced the dislocation with no ligamentous injury noted. (Id.).  The plaintiff was given an idle pass to relieve him from work while wearing a finger splint and was prescribed Ibuprofen to relieve the pain and swelling.  He was instructed to follow-up in 7-10 days.  The defendants' materials indicate that the plaintiff did not return for follow-up. (Id.).  However, pre-reduction and post-reduction films were reviewed by Dr. Hendershot, and then forwarded to radiologist review.  (Id.).  Dr. Perlin reviewed the films and diagnosed dorsal and mildly ulnar dislocation at the DIP joint of the little finger with mild soft tissue swelling.  (Id.).  Dr. Perlin noted that no fracture was obvious on the films that were provided.  Post-reduction films showed resolution of the dislocation with no fractures seen.  (Id.).

The defendants' materials indicate that, nowhere in the plaintiff's medical records is there a reference to nasal allergies, rhinitis, bronchitis, asthma, emphysema or any other smoking-related illness or symptoms. (Doc. No. 24, Ex. 4).

Based upon the above, the defendants argue that they are entitled to summary judgment on the basis of qualified immunity. (Doc. No. 23, pp. 24-37).

Under the doctrine of qualified immunity, "[g]overnment officials performing discretionary functions are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."

Sharrar v. Felsing, 128 F.3d 810, 826 (3d Cir.1997)(quoting Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)); In re City of Philadelphia Litig., 49 F.3d 45, 961 (3d Cir.1995). "Qualified immunity requires a two-step analysis. First, the Court must determine whether the plaintiff has alleged the violation of a constitutional right. Second, the Court must determine whether that right was 'clearly established' at the time of the alleged violation." Weaver v. Clarke, 45 F.3d 1253, 1255 (8th Cir. 1995).

Initially, with respect to the plaintiff's ETS claim, despite the plaintiff's claims to the contrary, (Doc. No. 12, p. 8), he is not entitled to a smoke-free environment. "Helling did not read the Eighth Amendment as mandating smoke-free prisons. It is impossible to read any such per se rule into Helling's 'objective' element." Scott v. District of Columbia, 139 F.3d 940, 942 (D.C.Cir. 1998).

To the extent that the plaintiff attempts to allege a claim of present injury because of exposure to ETS, the court must consider his claim under the Eighth Amendment pursuant to the standard set forth in Estelle v. Gamble, 429 U.S. 97 (1976). See Atkinson v. Taylor, 316 F.3d 257, 266 (3d Cir. 2003). In order to set forth a cognizable claim for a violation of his right to adequate medical care, the plaintiff must allege: (1) a serious medical need; and (2) behavior on the part of prison officials that constitutes deliberate indifference to that need. Estelle, 429 U.S. at 106.

Under the first prong of the Estelle standard, the plaintiff must

demonstrate that his medical needs were serious.  Serious medical needs include those that have been diagnosed by a physician as requiring treatment or that are so obvious that a lay person would recognize the necessity for doctor's attention, and those conditions which, if untreated, would result in lifelong handicap or permanent loss.  Monmouth County corr. Inst. Inmates v. Lanzaro, 834 F.2d 326, 347 (3d Cir. 1987), cert. denied, 486 U.S. 1006 (1988).

In his complaint and supporting memorandum, the plaintiff alleges that he suffered with eye irritation, nausea, headaches, and breathing problems as a result of his involuntary exposure to ETS.  However, in response to the defendants' submission of medical records which indicate that the plaintiff never complained of suffering smoke-related maladies, the plaintiff states that he never made any such complaints because he thought that the staff would think that he was lying or crazy.  (Doc. No. 29, p. 11).  Still later, the plaintiff admits that he does not exhibit allergies, nasal rhinitis, bronchitis, asthma, emphysema, or other related symptoms.  (Doc. No. 29, p. 12).  Given the lack of medical evidence in the record exhibiting that the plaintiff suffered any smoke-related maladies, as well as the plaintiff's own contradicting statements, the court finds that the plaintiff has failed to establish that he suffered any serious medical need as a result of any alleged involuntary exposure to ETS.  Moreover, even if the plaintiff had established that he suffered from serious medical needs, he has presented absolutely no

20

evidence that his medical needs were related to his exposure to ETS.  The plaintiff's unsupported claims are insufficient to establish a causal link between any alleged medical need and any alleged exposure to ETS.  See Richardson v. Spurlock, 260 F.3d 495, 498 (5th Cir. 2001).  Therefore, the plaintiff has failed to meet the first prong of the Estelle standard, and summary judgment should be granted in favor of the defendants.

Even assuming that the plaintiff could make it past the objective element of the Estelle standard, under the subjective component, the plaintiff would be required to show that prison officials acted with deliberate indifference to his serious medical needs.  "Deliberate indifference is more than mere malpractice or negligence; it is a state of mind equivalent to reckless disregard of a known risk or harm.  Farmer v. Brennan, 511 U.S. 825, 837-38 (1994).

Here, the plaintiff admits that he never complained to prison officials regarding any smoke-related illness.  Under the circumstances, the defendants cannot be held deliberately indifferent to a medical need of which they were not made aware.  Therefore, the plaintiff's claim for present injury related to exposure to ETS fails under the subjective component of Estelle as well.

In considering the plaintiff's claim for future injury due to involuntary exposure to ETS, the court must consider a similar standard to that set forth in Estelle.  To this extent, the plaintiff must establish: (1) that he was exposed

21

against his will to excessive levels of ETS, (i.e., the objective component), and (2) that prison officials were deliberately indifferent to this exposure, (i.e., the subjective component).  Helling v. McKinney, 509 U.S. 25, 35-36 (1993).

With respect to the objective component, the court must assess "whether society considers the risk that the prisoner complains of to be so grave that it violates contemporary standards of decency to expose anyone unwillingly to such a risk".  Id. at 36.  Ultimately, the plaintiff must show that "he himself is being exposed to unreasonably high levels of ETS ."  Id. at 35. Pursuant to Helling, this requires more than a "scientific and statistical inquiry into the seriousness of the potential harm and the likelihood that such injury to health will actually be caused by exposure to ETS."  It also requires that the plaintiff show that "the risk of which he complains is not one that today's society chooses to tolerate".  Id. at 36.

In this case, the plaintiff has generally alleged that from November 3, 2003, when he was admitted to FCI-Schuylkill, until November 14, 2004, when the no smoking policy went into effect, he was involuntarily exposed to unreasonable levels of ETS.  He further alleges that both staff and inmates violated the policy that restricted smoking to certain areas.  However, the plaintiff has submitted absolutely no evidence to establish that he was exposed to unreasonably high levels of ETS.  To this extent, he has provided no evidence as to the levels of ETS to which he was exposed.

Moreover, as previously discussed, the plaintiff admits that he never

22

complained to prison officials about any smoke-related illnesses during the time period in question.  Further, the plaintiff has not presented any evidence of increased harm to him in the future due to his exposure to ETS.

The plaintiff has provided a list of individuals who he claims were smoking in the facility despite the smoking restrictions.  (Doc. No. 34, pp. 2-3). However, this information does not provide the evidentiary support the plaintiff needs to support his claim.  Instead, the plaintiff must provide some kind of 'scientific and statistical inquiry into the seriousness of the potential harm and the likelihood that . . . injury to [his] health' was actually caused by exposure to ETS."  Scott, 139 F.3d at 941.

Finally, of significance is the fact that, although the plaintiff claims to be a non-smoker, the plaintiff himself purchased cigarettes and/or tobacco products.  The plaintiff alleges that he did so in order to use the products to barter within the institution.  Whether the plaintiff purchased the cigarettes for himself or for other inmates, any exposure to ETS was, at least in part, his own doing.

Given the above, the plaintiff has failed to satisfy the objective component of the Helling analysis.  Even if the plaintiff had done so, however, in order to satisfy the subjective factor, the plaintiff must establish that the defendants were deliberately indifferent to the harm posed to him by exposure to excessive levels of ETS.  In other words, the plaintiff must show that the defendants "knowingly and recklessly" disregarded a risk to his health by

23

failing to take reasonable measures to diffuse that risk.  <u>Farmer v. Brennan</u>, 511 U.S. 825 (1994).  In considering this component, the <u>Helling</u> court noted that the implementation and administration of a restrictive smoking policy "will bear heavily on the inquiry into deliberate indifference," and in light of the implementation of such policy "it could be very difficult to demonstrate that prison authorities are ignoring the possible dangers posed by exposure to ETS."  <u>Helling</u>, 509 U.S. at 36.

In this case, as previously discussed, there was a smoking policy in place by the BOP.  According to the defendants' materials, at all times relevant to this action, FCI-Schuylkill was in compliance with that policy.  In addition, there is no indication from the record that the federal defendants were aware of any risk to the plaintiff's health as a result of exposure to second hand smoke.

In addition, in his sur-reply, the plaintiff admits that staff members conduct "shakedowns" in order to confiscate contraband tobacco. (Doc. No. 34, p. 4).  The plaintiff indicates that these shakedowns have resulted in the confiscation of "considerable amounts" of tobacco. (<u>Id.</u>).  The fact that prison officials are conducting these shakedowns in an attempt to rid the facility of contraband tobacco is, in itself, evidence that the defendants are not exhibiting deliberate indifference.

Based upon the above, the plaintiff has failed to satisfy the subjective prong of <u>Helling</u>, and the defendants' motion for summary judgment should

be granted on this basis as well.

To the extent that the plaintiff alleges inadequate medical care for his injured right index finger, in order to establish an Eighth Amendment claim based upon allegations of denial of proper medical care, as previously discussed, an inmate must demonstrate a deliberate indifference to a serious medical need.  Estelle v. Gamble, 429 U.S. 97 (1976).  Again, this standard requires both deliberate indifference on the part of the prison officials and a serious medical need on the part of the prisoner.  See West v. Keve, 571 F.2d 158 (3d Cir. 1978).

A deliberate action is one which is intentional, requiring the actor to have knowledge of the events attributed to the injury and the ability to control the outcome.  "To establish a constitutional violation, the indifference must be intentional and the action related thereto deliberate."  Hampton v. Holmesburg Prison Officials, 546 F.2d 1077, 1081 (3d Cir. 1976).  A mere difference of opinion between the prison's medical staff and the inmate as to the diagnosis or treatment which the inmate receives, does not support an Eighth Amendment claim.  Farmer v. Carlson, 685 F. Supp. 1335, 1339 (M.D. Pa. 1988).  See McCracken v. Jones, 562 F.2d 22, 24 (l0th Cir. 1977); Smart v. Villar, 547 F.2d 112, 113 (l0th Cir. 1976).

As previously discussed, a medical need is "serious" where it has been diagnosed by a physician as mandating treatment, or if it is so obvious that even a lay person would easily recognize the necessity for a doctor's

25

attention.  See Gaudreault v. Municipality of Salem, Mass., 923 F.2d 203 (1st Cir. 1990), cert. denied, 500 U.S. 956 (U.S. Mass. June 3, 1991) (No. 90-7632)(citing Monmouth County Correctional Institutional Inmates v. Lanzaro, 834 F.2d 326 (3d Cir. 1987)).

The Supreme Court has held that negligence or inadvertence alone do not rise to the level of a constitutional deprivation.  Whitley v. Albers, 475 U.S. 312 (1986); Davidson v. O'Lone, 474 U.S. 344 (1986).  In Daniels v. Williams, 474 U.S. 327 (1986), the Court noted that "[l]ack of due care suggest no more than a failure to measure up to the conduct of a reasonable person."  Where a state of mind is relevant, the complaint is inadequate if it merely contains conclusory allegations describing the requisite state of mind such as "intentionally" or "recklessly" without supporting factual allegations.  Wilson v. Seiter, 501 U.S. 294 (1991).

Further, where a prisoner has received some medical attention and the dispute is over the adequacy of the treatment, the federal courts are generally reluctant to second guess medical judgment and to constitutionalize claims which sound in state tort law.  See  Ellison v. Scheipe, 570 F.Supp. 1361, 1363 (E.D.Pa. 1983); Inmates of Allegheny Jail v. Pierce, 612 F.2d 754,762 (3d Cir. 1979); See also Westlake v. Lucas, 537 F.2d 857, 860 n. 5 (6th Cir. 1976).  The key question is whether the defendant has provided the plaintiff with some type of treatment, regardless of whether it is what the plaintiff desired.  Farmer v. Carlson, supra, 685 F. Supp. at 1339.

Here, there is no dispute that the plaintiff suffered a serious medical need with respect to his injured finger.  The question becomes whether the defendants were deliberately indifferent to that need.  From the record, it is clear that the defendants were not deliberately indifferent to the plaintiff's medical need.  The fact is that the plaintiff is simply disagreeing with the treatment he received.  To this extent, the plaintiff was seen on August 2, 2003, when he initially injured his finger.  At that time, the area was sterilized and sutured, and the plaintiff was administered a tetanus shot.  In addition, it is indicated that it was discussed with the plaintiff that there was the possibility of some tendon damage.  The plaintiff was given instructions regarding caring for the wound and sutures.

Subsequently, on August 9, 2003, the plaintiff had his sutures removed. At that time, the plaintiff reported that his finger was still hurting, and was examined.  Upon examination, the plaintiff's finger showed mild swelling, with decreased movement and flexibility.  Distal blood flow was noted to be intact. The plaintiff reported that his finger was painful on flexion.  The plaintiff was prescribed Ibuprofen and Amoxicilin.

The plaintiff was again examined at sick call on September 10, 2003. At that time, the plaintiff presented with an inability to flex his right index finger at the proximal interphalangeal joint.  He was also noted to have a problem with full extension.  The laceration was noted to be healed.  The plaintiff was counseled regarding the injury and treatment, and was advised to continue

physical therapy.  The plaintiff was further referred for treatment as deemed necessary by an orthopedic specialist.

On or about October 10, 2003, the plaintiff was examined by Dr. Paul H. Steinfield, an outside orthopedic specialist, who noted that the plaintiff had decreased range of motion and that he should be treated three times per week for four weeks with exercises that would improve range of motion and tendon glide.  Dr. Steinfield noted no fracture or volar plate injury.  No follow-up appointment was scheduled.

On November 4, 2003, after having been transferred to FCI-Schuylkill, the plaintiff reported to sick call complaining of pain in his finger.  Upon examination, the plaintiff was prescribed anti-inflammatory medication and instructed on the proper usage of such medication.  The plaintiff was advised to watch the call-outs for a follow-up appointment.  The plaintiff was again referred to an orthopedic specialist for a second opinion.

On November 13, 2003, x-rays of the plaintiff's finger were reviewed. No bony abnormality was noted.  The plaintiff was noted to have soft tissue swelling about the PIP joint.  It was opined that, if there was a hyper-extension injury, this may represent a non-osseous volar plate injury.

On November 21, 2003, the plaintiff was again examined.  At that time, the plaintiff presented with extension difficulties with active range of motion.

On December 3, 2003, the plaintiff was examined by a contract orthopedic specialist, who noted no bone abnormality and no structural

tendon damage. It was noted that the plaintiff had decreased range of motion, which would need continued exercises to increase his range of motion. (Id.). Physical therapy was recommended to stretch the tendons.

On December 11, 2003, the plaintiff was referred to the Federal Medical Center at Devens, Massachusetts, for physical therapy via telemedicine. The plaintiff's diagnosis was noted to be a volar over-extension of the right index finger.

On December 23, 2003, the results of the orthopedic consult were discussed with the plaintiff. He agreed with the plan for physical therapy and indicated that he understood the medical findings.

Based upon the foregoing, it is clear that the plaintiff received medical treatment for his injured finger. It is equally clear, that the plaintiff is simply disagreeing with the treatment he received. However, the plaintiff's disagreement does not set forth a constitutional claim for consideration by this court. Therefore, the defendants' motion for summary judgment should be granted with respect to the plaintiff's claim of inadequate medical care for his injured finger.

## IV.    CONCLUSION

On the basis of the foregoing, **IT IS RECOMMENDED THAT:**

the defendants' motion to dismiss and for summary judgment,

**(Doc. No. 20)**, be **GRANTED**.


S/ Malachy E. Mannion
**MALACHY E. MANNION**
**United States Magistrate Judge**


**Date:**  August 29, 2006
O:\shared\REPORTS\2005 Reports\05-0887.01.wpd

30